O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR J. O., | Case No. 5:22-cv-02025-KES |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

## I.

## INTRODUCTION

On November 15, 2022, Plaintiff Hector J. O. ("Plaintiff") filed a complaint for review of denial of social security disability benefits. (Dkt. 1.) Plaintiff filed a "Motion for Remand" which constitutes Plaintiff's Brief ("PB") under the Rule 6 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g). (Dkt. 17.) Defendant filed a cross motion for summary judgement which constitutes the Commissioner's Brief ("CB") under the Rule 7. (Dkt. 20.) Plaintiff filed a reply brief ("PRB") on May 22, 2023. (Dkt. 21.)

For the reasons stated below, Plaintiff's motion for remand is DENIED and Defendant's motion for summary judgement is GRANTED.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.

## BACKGROUND

In March 2019, Plaintiff applied for Supplemental Security Income alleging a disability onset date of March 10, 2019, at age 43.  Administrative Record ("AR") 15, 206-12.  On January 26, 2022, an Administrative Law Judge ("ALJ") conducted a telephonic hearing at which Plaintiff, who was represented by counsel, appeared and testified along with a vocational expert ("VE").  AR 35-53.

On March 8, 2022, the ALJ issued an unfavorable decision.  AR 12-27.  The ALJ found that Plaintiff suffered from the severe, medically determinable impairments ("MDIs") of "status post traumatic brain injury; status post left clavicle, wrist, and left toe fracture; degenerative disc disease; arthralgia; myalgia; and obesity."  AR 17.  The ALJ found that Plaintiff's impairments of headaches and history of methamphetamine use disorder were not severe.  AR 17.

To determine Plaintiff's residual functional capacity ("RFC"), the ALJ considered Plaintiff's testimony about the limiting effects of his symptoms (AR 24-25) as well as Plaintiff's medical records (AR 23-24).  The ALJ also considered the medical opinions of State Agency medical consultants K. Lee, M.D. and Scott Spoor, M.D.  AR 25-26.  In July 2019, Dr. Lee found that Plaintiff had limited reaching with his "[l]eft in front and/or laterally" and his "[l]eft overhead."  AR 63.  Dr. Lee did not provide a further explanation.  In October 2019, Dr. Spoor found the same directional reaching limitations and quantified that Plaintiff was limited to reaching "frequently" with his left upper extremity.[1]  AR 77.

The ALJ found that despite Plaintiff's MDIs, he had the residual functional capacity ("RFC") to perform light work with some limitations on lifting/carrying

---

[1] In the context of social security claims, "occasionally" means up to 1/3 of the workday, while "frequently" means up to 2/3 of the workday.  Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-*6.

(20 pounds occasionally and 10 pounds frequently), standing/walking (2 hours in an 8-hour workday in 30-minute intervals), sitting (6 hours in an 8-hour workday), and postural activities (occasionally, but no climbing ladders, ropes, or scaffolds). AR 21-22.  The ALJ did not impose any limitations on Plaintiff's reaching.

The ALJ found that Plaintiff had no past relevant work.  AR 26.  Based on the RFC findings, the VE's testimony, and other evidence, the ALJ found that Plaintiff could work as an order clerk (Dictionary of Occupational Titles ["DOT"] 209.567-014), hand bander (DOT 920.687-030), and addressing clerk (DOT 209.587.010).  AR 26-27.  Per the DOT, the addressing and order clerk jobs require "frequent" reaching while the hand bander job requires "constant" reaching.  The ALJ concluded that Plaintiff was not disabled.  AR 27.

### III.

### ISSUES PRESENTED

Issue One:  Whether the ALJ provided specific, clear, and convincing reasons for rejecting Plaintiff's subjective symptom testimony.  (PB at 6-12.)

Issue Two:  Whether substantial evidence supports the ALJ's rejection of the opinions from Drs. Lee and Spoor.  (PB at 6, 12-15.)

Issue Three:  Whether substantial evidence supports the ALJ's determination that Plaintiff could perform work considering Plaintiff's left upper extremity reaching limitations.  (PB at 6, 15-18.)

Issue Four:  Whether the ALJ identified work Plaintiff could perform in occupations with a substantial number of positions in the national economy.  (PB at 6-7, 18-20.)

### IV.

### SUMMARY OF RELEVANT MEDICAL EVIDENCE

The ALJ provided a summary of the medical evidence following Plaintiff's car accident on March 10, 2019.  See AR 23-24.

3

**A.**    **Left Clavicle, Neck, and Back.**

X-rays of the left clavicle on March 11, 2019 (the day after the car accident in which an airbag was deployed, AR 316), showed "[a]cute, comminuted and mildly displaced mid-left clavicular fracture with inferior displacement of the distal fracture component."  AR 400; see AR 323, 378.  X-rays of the left foot on the same date showed an "[a]cute, mildly displaced oblique intra-articular fracture at the medial base of the great toe proximal phalanx."  AR 401; see AR 378.  X-rays of the left hand on the same date showed an "[a]cute mildly displayed triquetral fracture with dorsal soft tissue swelling."  AR 402; see AR 378.

On March 14, 2019, Plaintiff went to the hospital emergency room, complaining of chest and facial soreness.  AR 316.  Plaintiff reported he was not taking pain medication.  AR 316.  Physical examination did not reveal any abnormalities.  AR 317-18.  X-rays of the chest were unremarkable except for the left clavicle fracture.  AR 717.  Plaintiff received a partial cast on the left wrist and left foot, with a surgical shoe.  See AR 318, 356.  Plaintiff was given a Toradol injection for the pain, and over-the-counter pain medication was recommended.  AR 320.

X-rays of the lumbar spine on March 20, 2019, did not show anything significant except for a possible minimal compression fracture at L1.  AR 344, 398.  X-rays of the cervical spine on the same date showed mild to moderate degenerative disc disease at C5 through C7 with the encroachment of the neural foramina, but otherwise were unremarkable.  AR 397.  X-rays of the thoracic spine on the same date were unremarkable.  AR 399.

X-rays of the left clavicle on March 26, 2019, showed a "[m]arkedly displaced comminuted fracture of the mid shaft of the left clavicle with one shaft width of inferior displacement of the distal fracture fragment."  AR 434; see also AR 438, 440, 442-43, 447 (X-rays of the left clavicle and left shoulder on April 17, 2019, May 13, 2019, and May 20, 2019); AR 446 (MRI of the chest on May 20,

2019).

On March 29, 2019, Plaintiff went to a follow-up appointment at High Desert Orthopedics, complaining of pain in the left clavicle, left wrist, left knee, and left foot.  AR 510.  Physical examination revealed swelling and tenderness in the left mid clavicle, but the shoulder had full range of motion and no tenderness.  AR 510.

On April 4, 2019, Plaintiff received a clavicle brace.  AR 357; see AR 510.  X-rays of the left knee on April 11, 2019 and of the right knee on April 26, 2019 showed minimal degenerative joint disease, but were otherwise unremarkable.  AR 395-96.

An MRI of the left wrist on May 16, 2019, showed an acute multipart fracture of the left trapezoid bone, "osseous edema in the adjacent base of the second metacarpal likely representing concurrent contusion or nondisplaced fracture," thickening and instrasubstance signal change along the ulnar groove of the extensor carpi ulnaris tendon representing tendinosis and tendinitis, and subluxation of the tendon from the ulnar groove.  AR 443-44.[2]

From March 20, 2019 through May 20, 2019, Plaintiff obtained treatment at Apple Valley Christian Care Center/Choice Healthcare Associates – Apple Valley ("Choice Healthcare"), primarily for hypertension.  AR 367-74, 459, 461.  Physical examinations did not reveal any abnormalities.  AR 368 (5/20/19), 373 (4/10/19), 378-79 (3/20/19).  Plaintiff was started on ibuprofen and cyclobenzaprine (brand name, Flexeril), a muscle relaxant (AR 379: 3/20/19) and on Mobic (generic name, meloxicam), a nonsteroidal anti-inflammatory drug ("NSAID") (AR 375: 4/1/19).

On May 23, 2019, Plaintiff underwent an open reduction and internal fixation of the left clavicle.  AR 412-13, 417, 587-88; see AR 682.

---

[2] X-rays of the left wrist on March 26, 2019, were "limited by overlying casting material."  AR 435.

X-rays of the left clavicle on July 26, 2019, showed "evidence of a previous ORIF [open reduction and internal fixation] of a fracture of the midshaft of the left clavicle," fragments in excellent apposition, "evidence of bony fusion at the site of the fracture," and normal left acromioclavicular space.  AR 451; see also AR 450 (X-rays of the left clavicle on May 25, 2019 showed satisfactory position and alignment).

From August 6, 2019 through August 20, 2019, Plaintiff obtained treatment from Choice Healthcare for hypertension, concussion, fracture, and cholesterol. AR 461-69.  Plaintiff complained of continuing low back pain and of difficulty bending, standing excessively, bending his left arm (lifting heavy items), and bending his wrist.  AR 464.  Physical examination on August 6, 2019, was unremarkable, except for pain at the level clavicle where he had surgery, but with approximately 4/5 strength, and except for pain on direct palpation of the lower lumbar region.  AR 465.

Plaintiff sought treatment for his shoulder, neck, and back pain at Universal Pain Management ("Universal") on August 16, 2019.  AR 760-63.  Plaintiff reported having a constant aching and sting pain which increased with all activity. AR 760.  Pain reported his pain level as 9/10.  AR 760, 762.  Plaintiff's current medications were ibuprofen and Tylenol with codeine.  AR 760.  Physical examination revealed the following:  he was able to transition from a seated to a standing position with mild to moderate difficulty; the neck did not have any swelling, erythema or redness at the neck but range of motion was limited; there was pelvic obliquity, the lumbar paraspinal muscles and SI joints were tender to palpation, back range of motion was limited, and straight leg raising tests were positive on the right and the left; muscle stretch reflexes in the upper and lower extremities were 2+ and sensation was decreased; gait was antalgic and he did not require the use of an assistive device or brace; and the extremities did not show cyanosis, clubbing, or edema.  AR 762.

1    An MRI of the cervical spine on August 30, 2019, revealed "[m]ild
2 degenerative disc disease and spondylosis with underlying congenital spinal
3 stenosis and small disc osteophyte complexes," "[m]ild to moderate spinal stenosis
4 at C5-6 and C6-7," and "[m]ild to moderate foraminal stenosis from C4-5 to C6-
5 7." AR 756-77; see AR 748. An MRI of the lumbar spine on August 30, 2019,
6 revealed "[m]ild degenerative disc disease with small posterior disc bulge at L5-
7 S1," "mild bilateral foraminal stenosis at L4-5 and L5-S1" [and] "[¶]race lateral
8 recess narrowing at L4-5," and "multilevel facet hypertrophy, most notably at L4-
9 5." AR 758-59; see AR 748.

10    In September 2019, Plaintiff began physical therapy for his neck and back
11 pain. See AR 755.[3]

12    On September 18, 2019, Plaintiff returned to Universal. Plaintiff reported
13 intermittent pain that was aching, sharp, and shooting. AR 752. Plaintiff also
14 reported low back pain which was constant and radiating. AR 752. Plaintiff
15 reported his pain level as 6/10, but he was not taking any medications. AR 752,
16 754. Physical examination revealed the same results as on August 16, 2019. AR
17 754.

18    Plaintiff went to an appointment at Universal on December 27, 2019,
19 complaining of pain varying in intensity. AR 747. Plaintiff reported that his pain
20 level with medications was 5/10 and without medications was 9/10. AR 747.
21 Plaintiff requested and was prescribed Tylenol with codeine, which he said had
22 been very effective in the past. AR 747, 749-50.

23    From March 6, 2020 through August 18, 2020, Plaintiff obtained treatment
24 from Choice Healthcare for methamphetamine abuse in remission, a compression
25 fracture at L1, concussion, hypertension, prediabetes, and cholesterol. AR 801.
26 On March 6, 2020, Plaintiff complained of intermittent spasms. AR 810. Physical

27 _____

28    [3] It appears that there are no physical therapy records in the AR.

examination revealed unremarkable results, except for pain in the left clavicle (although strength was approximately 4/5), and pain on direct palpation of the paraspinal region.  AR 811.  On August 6, 2019, Plaintiff complained of continuing low back pain and of difficulty bending, standing excessively, bending his left arm (lifting heavy items), and bending his wrist.  AR 464.  Physical examination did not reveal any abnormalities.  AR 465.  On August 18, 2020, Plaintiff complained of low back and mid back constant, non-radiating pain, stiffness, and decreased range of motion.  AR 804.  Symptoms were exacerbated by weight bearing, lifting, back motion, standing, prolonged standing, sitting, prolonged sitting, bending, straining, and supine position.  AR 804.[4]

On May 10, 2020, Plaintiff went to the hospital emergency room regarding a throat issue.  AR 544.  Physical examination revealed no issues with Plaintiff's neck and extremities.  AR 545-46.

On July 1, 2020, Plaintiff returned to Universal, and complained of constant and dull pain in the low back and bilateral knees.  AR 792.  Plaintiff reported he rarely took opioid medication and stated he would prefer non-opioid treatment.  AR 792.  Plaintiff reported his pain level as 7/10.  AR 792-93.  Plaintiff was prescribed Mobic (generic name, meloxicam), a nonsteroidal anti-inflammatory drug ("NSAID").  AR 794.

On July 29, 2020, Plaintiff had his first telehealth visit at Universal.  Plaintiff complained of pain in the head, neck, back, and knees.  AR 788.  Plaintiff stated he was less functional because of increased pain.  AR 788.  Plaintiff reported that Mobic was "only very minimally effective" and requested stronger medication.  AR 788.  Plaintiff reported his pain level as 10/10.  AR 788-89.

At his next telehealth visit at Universal on August 26, 2020, Plaintiff

---

[4] Plaintiff later did not show up for appointments at Choice Healthcare on September 4, 2020 and January 12, 2021.  AR 801-03.

complained of pain in his neck, low back, and lower extremities.  AR 784.
Plaintiff reported having "partial symptomatic relief and moderate functional
improvement with [his] current medication regimen."  AR 784.  Plaintiff reported
his pain level as 8/10.  AR 784-85.

On November 13, 2020, Plaintiff had another telehealth visit with Universal,
and made the same complaints as in August.  AR 780.  Plaintiff reported taking
tramadol intermittently and mostly taking CBD oil for his pain.  AR 780.  Plaintiff
reported his pain as 6/10.  AR 780-81.

At his next telehealth visit at Universal on January 5, 2021, Plaintiff
complained of constant cervical spine and low back pain that varied in intensity.
AR 772.  Plaintiff was taking CBD oil for his pain.  AR 773.  Plaintiff reported his
pain as 5/10.  AR 773.

On February 2, 2021, at another telehealth visit at Universal, Plaintiff
complained of low back pain which was aggravated by increased activity
movements.  AR 766.  Plaintiff reported he had stopped taking narcotic pain
medication (he suffered side effects) and was taking CBD oil.  AR 766.  Plaintiff
reported his pain level as 7/10.  AR 766, 767.

At his next telehealth visit at Universal on May 18, 2021, Plaintiff
complained of intensified pain in his low back (described as constant and
radiating), and requested stronger medication.  AR 899-900.  It was noted that
Plaintiff had tried and failed the course of a home exercise program and NSAIDs.
AR 899.  Plaintiff reported his pain level as 7/10.  AR 899.  Plaintiff was
prescribed Tylenol with codeine.  AR 902.

On June 15, 2021, at his next telehealth visit at Universal, Plaintiff
complained of low back pain, and requested pain medication refills.  AR 894-95.
Plaintiff reported that the pain medication "allow[ed] him to be functional."  AR
894.  Plaintiff reported his pain level as 8/10.  AR 894-95.

At another telehealth visit at Universal on July 30, 2021, Plaintiff

complained of low back pain, but reported that his pain had decreased and that he rarely takes his pain medication.  AR 886.  Plaintiff reported that "Tylenol with codeine has been helpful when he needs it" and that he had stopped taking tramadol since he tested positive for tramadol at his last urine drug screening test.  AR 886.  Plaintiff reported his pain level as 6/10.  AR 886-87.

On October 5, 2021, at his next telehealth visit at Universal, Plaintiff complained of low back pain, and reported that his pain medication was inadequate for his pain level.  AR 881-82.  Plaintiff reported his pain level as 8/10.  AR 882-83.  Plaintiff was prescribed Norco (generic name, hydrocodone), an opioid.  AR 884.

At a telehealth visit at Universal on November 2, 2021, Plaintiff complained of low back pain.  AR 872.  Plaintiff reported having migraine headaches.  AR 872.  Plaintiff reported that Norco was not effective (so it was discontinued).  AR 872.  Plaintiff reported his pain level as 6/10.  AR 872-73.  Plaintiff was prescribed gabapentin (brand name, Neurontin), an anticonvulsant and nerve pain medication.  AR 874-75.

**B.    Brain.**

On May 21, 2019, Plaintiff sought treatment at High Desert Neurology Diagnostic Medical Group ("High Desert"), complaining of daily pounding and throbbing headaches since the accident.  AR 404.  Plaintiff also complained of short-term memory loss since the accident (it was noted that Plaintiff's mini-mental state examination ["MMSE"] score was 28/30, indicating low normal cognition).  AR 404-05.  Plaintiff reported taking ibuprofen and Flexeril.  AR 404.  Plaintiff reported his pain level as 8.9/10.  AR 404.  While Plaintiff reported decreased memory, he did not report any difficulty speaking, dizziness, fainting, numbness, paresthesias, trouble walking, unsteadiness, vertigo, or weakness.  AR 405.  Neurological examination revealed "normal attention span and ability to concentrate and ab[ility] to name objects and repeat phrases" and "[a]ppropriate

fund of knowledge." AR 405. Plaintiff was prescribed diclofenac, a NSAID, and nortriptyline, a nerve pain medication. AR 406.

An MRI of the brain on June 4, 2019, showed "[v]ery mild scattered subcortical white matter T2/FLAIR hypersensitivities [that] are nonspecific but may represent sequela of chronic migraine headaches." AR 428.

At an appointment with Choice Healthcare on August 6, 2019, Plaintiff reported having trouble with his memory and experiencing headaches without vision changes. AR 464. Plaintiff's mother, who was at the appointment, reported that Plaintiff had memory problems and recurrent headaches. AR 465.

On November 22, 2019, Plaintiff returned to High Desert, and complained of having headaches every five days. AR 862. Plaintiff reported he was not going to take analgesics. AR 832. Neurological examination the same results as in May 2019. AR 863.

At a telehealth visit at High Desert on June 24, 2020, Plaintiff reported having headaches, a short attention span, and poor retention capacity. AR 860. Plaintiff again did not report any difficulty speaking, dizziness, fainting, numbness, paresthesias, trouble walking, unsteadiness, vertigo, or weakness. AR 860. Neurological examination revealed the same results as in May 2019. AR 861. However, at an appointment at Choice Healthcare on August 18, 2020, Plaintiff reported that his headaches had improved. AR 805.

On October 22, 2020, at his next telehealth visit at High Desert, Plaintiff reported the same issues as in June. AR 858. Plaintiff again did not report any difficulty speaking, dizziness, fainting, numbness, paresthesias, trouble walking, unsteadiness, vertigo, or weakness. AR 858. Neurological examination revealed the same results as in May 2019, except for a slightly impaired short term memory (MMSE 27/30, representing mild cognitive impairment). AR 858-59. Plaintiff was prescribed methylphenidate, a stimulant, and was referred for a neurocognitive examination. AR 858-59.

At his next telehealth appointment at High Desert on February 23, 2021, Plaintiff reported his headaches had subsided.  AR 856.  Neurological examination revealed the same results as in October 2020, except for a slight improvement in his short term memory  (MMSE 28/30).  AR 856-57.

An MRI of the brain on March 9, 2021 did not show significant changes from the June 4, 2019 MRI.  AR 864.

At an appointment at Choice Healthcare on March 30, 2021, Plaintiff reported that he has a short attention span since he was younger.  AR 916.

On August 24, 2021, Plaintiff had a telehealth visit at High Desert. Plaintiff's headaches were noted to have subsided.  AR 867.  Plaintiff complained of memory loss.  AR 867.  Neurological examination revealed the same results as in February, except for a decrease in short term memory (MMSE 25/30).  AR 867-68.  Plaintiff was noted to have missed his appointment for a neurobehavioral and neurocognitive examination with a neuropsychologist,  AR 867.  Plaintiff was advised to reschedule that appointment and to follow up with his neurologist in six months.  AR 867.

## IV.

## DISCUSSION

**A.**      **ISSUE ONE: Plaintiff's Symptom Testimony.**

Plaintiff contends that the ALJ erred by failing to give clear and convincing reasons for rejecting Plaintiff's subjective symptom testimony.[5]  Plaintiff specifically argues that the ALJ failed to provide clear and convincing reasons for rejecting "Plaintiff's statements about his durational limitations [regarding] standing, walking, and sitting; his issues reaching with his left upper extremity; his

---

[5] Plaintiff concedes that the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony about his short-term memory loss.  (PB at 10-11.)

1    need to alternate positions, [and] his reliance on a cane."  (PB at 6-12.)

2        **1.    Relevant Law.**

3        The ALJ engages in a two-step analysis to evaluate a claimant's subjective

4    symptom testimony.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir.

5    2007).  "First, the ALJ must determine whether the claimant has presented

6    objective medical evidence of an underlying impairment [that] could reasonably be

7    expected to produce the pain or other symptoms alleged."  Id. at 1036.  If so, the

8    ALJ may not reject a claimant's testimony "simply because there is no showing

9    that the impairment can reasonably produce the degree of symptom alleged."

10   Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

11       Second, if the claimant meets the first test, the ALJ may discredit the

12   claimant's subjective symptom testimony only by making specific findings that

13   support the conclusion.  Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010);

14   Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).  Unless an ALJ finds that a

15   claimant is malingering or has failed to provide objective medical evidence in

16   support of his or her testimony, an ALJ must provide clear and convincing reasons

17   for rejecting a claimant's subjective testimony about the severity of experienced

18   symptoms.  Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015).  While

19   an ALJ's findings must be properly supported and sufficiently specific to assure a

20   reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective

21   statements, an ALJ is not "required to believe every allegation" of disability.  Fair

22   v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).[6]

23

24       [6] SSR 16-3p, 2017 WL 5180304, which is applicable to this case, eliminated
     the term "credibility" from the Agency's sub-regulatory policy.  SSR 16-3p makes
25   clear "that assessments of an individual's testimony by an ALJ are designed to
     'evaluate the intensity and persistence of symptoms after the ALJ finds that the
26   individual has a medically determinable impairment(s) that could reasonably be
     expected to produce those symptoms,' and not to delve into wide-ranging scrutiny
27   of the claimant's character and apparent truthfulness." Trevizo v. Berryhill, 871

28

### 2.  Summary of Plaintiff's Testimony.

The ALJ summarized Plaintiff's testimony as follows:

The claimant alleges "car accident", broken left clavicle, fractured left wrist, broken left toe, and torso and back injuries as conditions that limit his ability to work ([AR 230]).  The claimant asserts that he is unable to work due to limitations as to standing, walking, sitting, and lifting, as well as memory loss.  The claimant testified at the hearing that he can stand for 15-20 minutes at a time, walk for 25-30 minutes at a time, and sit for 20-25 minutes at a time.  He testified that he needs to change positions often.  He testified that he can lift 25-30 pounds.  He testified that he has difficulty reaching overhead with his left arm due to his history of a broken clavicle.  The claimant testified that he is right-handed.  He further testified that he is able to drive a car, and that he can drive for 45 minutes to 1 hour at a time.  He testified that he usually has migraines every other day, but sometimes he goes as long as a week without having a migraine.  He takes medication for his migraines.  The claimant testified that he has short-term memory loss, and that he loses his train of thought.  He testified that he lies down five to six times during a typical day, for 45 minutes to one hour at a time, to help relieve his back and knee pain. The claimant testified that the pain does not go away after he lies down, but it gets better.  He testified that he uses a cane "on and off" to help himself to stand up after sitting for a long period of time, and he uses a cane to ambulate after walking for 25-30 minutes (without a cane).  The claimant testified that the cane was not prescribed by a doctor.  He testified he has pain in his neck, back, and knees when he

_____

F.3d 664, 678 n.5 (9th Cir. 2017) (quoting SSR 16-3p) (alterations omitted).

gets dressed and puts his shoes on.  He testified that he vacuums his
room, but does not do any other household chores; the claimant
testified that he lives with his mother, and she does most of the
household chores. The claimant testified that he is able to go shopping
for groceries.  When questioned about his methamphetamine use, the
claimant testified that he used to "dabble in it quite a bit" when he was
younger.  The claimant testified that he stopped using
methamphetamine 10-11 years ago.

AR 22-23.

### 3.    Analysis of the ALJ's Evaluation of Plaintiff's Testimony.

The ALJ found that while Plaintiff's MDIs "could reasonably be expected to
cause the alleged symptoms," Plaintiff's "statements concerning the intensity,
persistence and limiting effects of these symptoms are not entirely consistent with
the medical evidence and other evidence in the record for the reasons explained in
this decision." AR 23.  The ALJ gave at least three reasons for discounting
Plaintiff's symptom testimony: (1) the lack of supporting objective medical
evidence (AR 25); and (2) inconsistency with his reported activities (AR 25); and
(3) inconsistency with his report to a medical provider about the cause of a
symptom  (AR 25).

a.    Reason One: Lack of Supporting Objective Medical Evidence.

The ALJ noted that physical examination findings throughout the period at
issue did not support Plaintiff's testimony about the extent of his functional
limitations.  AR 24.  Examinations of Plaintiff's neurological and musculoskeletal
systems revealed mostly normal results.  See AR 379 (3/20/19: normal sensation,
normal coordination, intact upper and lower extremity deep tendon reflexes,
normal strength and tone of the left and right upper and lower extremities), 373
(4/10/19: same as on 3/20/19), 368 (5/20/19: same as on 3/20/19), 465 (normal
strength and tone of the right upper and lower extremities and the left lower

extremity; pain in the left clavicle where there was surgery, but approximately 4/5 strength; pain on direct palpation in the lower lumbar region), 863 (11/22/19: normal gait and station, normal muscle strength and tone in all extremities, intact sensation), 811 (3/6/20: same as on 11/22/19, plus Plaintiff has some stiffness when "getting from a seated position"), 546 (5/10/20: no swelling of the neck and no cervical lymphadenopathy; normal appearance and no tenderness of the extremities), 861 (6/24/20: same as on 11/22/19), 858 (10/22/20: same as on 11/22/19), 857 (2/23/21: same as on 11/22/19), 868 (8/4/21: same as on 11/22/19).

The ALJ also noted that imaging records and records pertaining to Plaintiff's surgery on his left clavicle did not support Plaintiff's testimony.  AR 24.  X-rays of the chest, left shoulder, lumbar spine, thoracic spine, cervical spine, left wrist, left knee, and left foot, as well as MRIs of the left wrist, cervical spine, and lumbar spine do not show significant issues related to those body parts.  AR 323, 344, 401-02, 431, 433-37, 440-41, 444-46, 756-59.  While X-rays of the chest, left clavicle, and left shoulder prior to left clavicle surgery on May 23, 2019, revealed a fractured left clavicle (AR 323, 400, 434, 438, 440, 442-43, 446-47), X-rays of the left clavicle and records post-surgery indicate the procedure was successful.  AR 450-51, 682.

The ALJ's discounting of Plaintiff's subjective symptom testimony regarding his limited abilities to stand, walk, sit, and reach with his left upper extremity, his need to alternate positions, and his need for a cane after long periods of sitting and walking because it was inconsistent with the objective medical evidence was a clear and convincing reason supported by substantial evidence.  See Carmickle v. Commissioner, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

Plaintiff contends that the ALJ did not (1) address Plaintiff's testimony about his limitations in standing, sitting, and reaching with his left upper extremity,

his need to alternate positions, and his need to use a cane after sitting or walking for a long period, and (2) point to specific evidence undermining such testimony. (PB at 9-12).

The ALJ's decision, when viewed in context, addressed such testimony. Moreover, as discussed above, the ALJ adequately identified the lack of support for Plaintiff's alleged symptoms from Plaintiff's medical records.

b.    Reason Two:  Inconsistency with Reported Activities.

The ALJ wrote that "the claimant testified at the hearing that he is able to stand for 15-20 minutes at a time and walk for 25-30 minutes at a time, drive a car, go shopping for groceries, lift 25-30 pounds, and vacuum his living area, all of which reflect significant improvement in the claimant's physical abilities since the date of completion of the Exertion Questionnaire."  AR 25.

An ALJ may "consider whether the claimant engages in daily activities inconsistent with the alleged symptoms."  Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022).  In Smartt, the claimant reported doing laundry, grocery shopping, and caring for her young daughter, "albeit in short increments due to pain."  Id. at 500.  The Ninth Circuit concluded that "the ALJ's determination that Smartt's self-reported activities were inconsistent with the constant '10/10' pain she described was not unreasonable."  Id.

Similarly, Plaintiff testified that he participated in activities including driving a car for 45 minutes to an hour, vacuuming his small room, grocery shopping with his mother, and walking around the mall.  AR 40, 43-46.  Given the extremity of his symptom testimony (e.g., that he does not do any chores except for sometimes vacuuming his room, that the only chore he does is make his bed, that he lies down five to six time a day for 45 to 60 minutes, that he needs to nap three times a day for 2 to 3 hours, AR 43-44, 254, 256), the ALJ, like the ALJ in Smartt, could reasonably find that Plaintiff's testimony was inconsistent with even his limited activities.  See Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012)

17

("Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001) (ALJ correctly found that a claimant's "claim to have totally disabling pain was undermined by her own testimony about her daily activities").

           c.    <u>Reason Three</u>: Inconsistency with Medical Provider Report.

The ALJ found that, although Plaintiff testified about memory loss resulting from the accident (AR 41, 256), although Plaintiff repeatedly complained to medical providers about decreased memory resulting from the accident (AR 404-05, 464, 860), and although an October 2020 progress note states that Plaintiff had a short attention span and very poor immediate recall (AR 858), Plaintiff reported to a medical provider in March 2021 that "[t]he low attention span and fidgeting he has had since he was younger" (AR 916).  AR 24.

The record supports the ALJ's finding that Plaintiff did not consistently report the cause of his memory loss.  This is not merely a lack of objective support for Plaintiff's pain allegations.  Inconsistent symptom reporting provides a third clear and convincing reason for discounting Plaintiff's testimony.  <u>See</u> <u>Medina v. Saul</u>, 840 Fed. Appx. 71, 73 (9th Cir. 2020) (the ALJ's finding of inconsistent symptom reporting was a clear and convincing reason for discounting the claimant's testimony).

**B.**    **ISSUE TWO: The Medical Opinion Evidence.**

Plaintiff contends that the ALJ erred in rejecting the opinions of State Agency medical consultants Dr. Lee and Dr. Spoor about Plaintiff's left upper extremity reaching limitations.  (PB at 6, 12-15, citing AR 63 [Dr. Lee in 7/19: Plaintiff had limited reaching with his "[l]eft in front and/or laterally" and his "[l]eft overhead"], and 77 [Dr. Spoor in 10/19: Plaintiff was limited to frequent reaching of his left upper extremity]).

1

### 1.    Relevant Law.

An ALJ must consider all relevant medical opinions of record.  20 C.F.R. § 416.927(b).  For applications filed after March 27, 2017, like Plaintiff's, 20 C.F.R. § 416.920c applies.  Under the updated regulation, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 416.920c(a).  Instead, an ALJ evaluates medical opinions and prior administrative findings by assessing their "persuasiveness."  Id.  An ALJ's determination of the persuasiveness of medical opinions is based on "supportability," "consistency," "relationship with the claimant," "specialization," and "other factors."  20 C.F.R. § 416.920c(c)(1)-(5).  An ALJ is no longer required to provide "specific and legitimate" reasons for rejecting a doctor's opinion.  See Woods v. Kijakazi, 32 F.4th 785, 787 (9th Cir. 2022).  Rather, an ALJ's decision to discredit any medical opinion "must simply be supported by substantial evidence."  Id.

### 2.    The ALJ's Treatment of the Opinion Evidence.

The ALJ found Dr. Lee's and Dr. Spoor's opinions about Plaintiff's physical assessments "less persuasive" "because updated evidence at the hearing level supports a finding that the claimant is limited to light work."  AR 25.  As support for that finding, the ALJ cited to the August 2019 MRI of Plaintiff's lumbar spine.  AR 25-26, citing AR 759.  The ALJ did not include in Plaintiff's RFC any limits on reaching.

### 3.    Analysis of Claimed Error.

Plaintiff contends that his RFC should have "left upper extremity reaching limitations."  (PB at 9.)  Plaintiff cites Dr. Spoor's opinion that Plaintiff's left arm reaching is limited to "frequently," calling this opinion "substantially supported by and consistent with the medical evidence on record."  (PB at 14.)  The Court, therefore, understands Plaintiff to be arguing that the ALJ erred by rejecting Dr.

Lee's and Dr. Spoor's opinions about Plaintiff's reaching limitations and should have included in Plaintiff's RFC a limitation to "frequent" left side reaching.

Defendant argues that even if the ALJ erred by not limiting Plaintiff to frequent left side reaching, the error was harmless because two of the potential jobs identified – order clerk and addressing clerk – only require frequent reaching. (CB at 12-13.) Accepting the VE's testimony about the number of positions available nationally, those two jobs together provide a significant number of jobs. (CB at 12-13.)

Plaintiff only addresses this harmless error argument in a perfunctory manner. (PRB at 7.)

The Court agrees with Defendant's harmless error analysis. Plaintiff has not met his burden on appeal of demonstrating harmful error.

## C.   <u>ISSUE THREE: The ALJ's Questioning of the VE.</u>

At step five, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in significant numbers in the national or regional economy, considering the claimant's RFC, age, education, and work experience. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); 42 U.S.C. § 423(d)(2)(A). An ALJ may satisfy that burden by asking a VE a hypothetical question reflecting all the claimant's limitations that are supported by the record. <u>Hill v. Astrue</u>, 698 F.3d 1153, 1161 (9th Cir. 2012); see <u>Thomas v. Barnhart</u>, 278 F.3d 947, 956 (9th Cir. 2002).

Plaintiff contends that the ALJ's determination that Plaintiff could perform the three identified jobs was improper because the ALJ relied on the testimony of a VE who was not given a hypothetical question which included all of Plaintiff's impairments, specifically, Plaintiff's left upper extremity reaching limitations. (PB at 6, 15-18).

The same harmless error analysis discussed in Issue Two applies to Issue Three. Plaintiff has not met his burden on appeal of demonstrating harmful error

caused by the ALJ's posing a hypothetical to the VE that did not limit Plaintiff to frequent left side reaching.

**D.      ISSUE FOUR: Plaintiff's Suitable Work.**

Again, the ALJ found that Plaintiff could work as an order clerk (18,654 positions available), an addressing clerk (30,697 positions available), and a hand bander (21,756 positions available).  AR 27.  Plaintiff argues that if one considers neither the hand bander job (because it requires "constant" reaching) nor the addressing clerk job (because it is "obsolete"), then one is left with only 18,654 jobs nationally, which does not constitute a substantial number.  (PB at 19.)

Defendant responds that the ALJ (1) properly rejected the reaching limitations assessed by Drs. Lee and Spoor, so he could consider the hand bander job, and (2) was entitled to rely on the VE's testimony about the number of addressing clerk jobs available.  (CB at 12.)

**1.      Relevant Administrative Proceedings.**

The ALJ questioned the VE about jobs a hypothetical worker with Plaintiff's RFC could perform.  AR 48-50.  The VE identified three potential jobs and testified about the number of available positions.  AR 50-51.  Plaintiff's counsel did not question the VE about this testimony.

After the hearing, Plaintiff requested review of the ALJ's decision.  AR 201-203.  This request was exhibited by the Appeals Council.  AR 1, 4.  The request for review does not identify any challenge to the VE's testimony about the number of available jobs.  The AR does not contain any alternative evidence submitted by Plaintiff on this issue.

**2.      Relevant Law.**

a.      A "Significant Number" of Jobs.

An "individual shall be determined to be under a disability" only if his impairments prevent her from engaging in "substantial gainful work which exists in the national economy"—i.e., "work which exists in significant numbers either in

the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).  The burden of establishing that work exists in "significant numbers" lies with the Commissioner. Tackett, 180 F.3d at 1099.

The Ninth Circuit has "never set out a bright-line rule for what constitutes a 'significant number' of jobs." Beltran v. Astrue, 700 F.3d 386, 389 (9th Cir. 2012).  "[A] comparison to other cases is instructive." Id.  In Beltran, the Ninth Circuit held that 1,680 national jobs was not a significant number.  See id. at 390. At the other side of spectrum, the Ninth Circuit in Gutierrez v. Comm'r of SSA, 740 F.3d 519, 529 (9th Cir. 2014) held that the ALJ did not err in concluding that 25,000 national jobs, although a "close call," constituted a significant number.  In so holding, Gutierrez cited with approval to an Eighth Circuit decision holding that 10,000 national jobs was significant.  See id. (citing Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997)).  Following Gutierrez, various district courts have found that numbers near 21,000 constituted a significant number. See, e.g., Anna F. v. Saul, 2020 WL 7024924, at *6 (C.D. Cal. Nov. 30, 2020) ("Whether 21,100 jobs in the national economy is 'significant' is not entirely settled, yet the relevant caselaw indicates it is."; citing cases).

### b.    Substantial Evidence and Waiver.

District courts review an ALJ's factual findings to determine if they lack substantial evidentiary support.  42 U.S.C.S. § 405  ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ….").  "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citations omitted).

To obtain evidentiary support for needed findings about the number of available jobs, ALJs will often solicit testimony from VEs.  VEs may use a wide range of data sources and methodologies to generate job-number estimates.  See

Biestek v. Berryhill, 139 S. Ct. 1148, 1152-53 (2019) (describing different types of data sources VEs may use).  As recently observed by Ninth Circuit:

> Although a VE may be cross-examined during the proceedings about the data sources or methodologies underlying her job-number estimates, there is no requirement that a VE disclose the primary data underlying the estimates prior to, during, or after the hearing. …
> Indeed, the Supreme Court recently held that VE job-numbers testimony may constitute substantial evidence supporting a finding of no disability even if the VE refuses to disclose the specific, non-public data sources on which the estimates were based.  Biestek, 139 S. Ct. at 1157.

White v. Kijakazi, 44 F.4th 828, 834-35 (9th Cir. 2022) (citations omitted). Generally, "uncontradicted VE job-numbers testimony" is considered "inherently reliable" and "ordinarily sufficient by itself to support an ALJ's step-five finding." (Id. at 835.)  A VE, however, may "offer testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar."  Biestek, 139 S. Ct. at 1155-56.  The substantial evidence inquiry for VE testimony must proceed on a "case-by-case" basis, taking "into account all features of vocational expert's testimony, as well as the rest of the administrative record."  Id. at 1157.

"Social security disability claimants must raise challenges to the accuracy of a VE's job-number estimates at some point during administrative proceedings to preserve the challenge on appeal in federal district court."  Id. (citing Shaibi v. Berryhill, 883 F.3d 1102, 1103 (9th Cir. 2017)).

**3.   Analysis.**

First, Plaintiff waived any challenge to the VE's testimony about the number of available addressing clerk jobs.  None of the facts presented to this about obsolescence were presented to the ALJ or Appeals Council.  The AR contains no evidence challenging the VE's job-numbers testimony.

Second, even if this issue were not waived, nothing in the VE's testimony or the rest of the AR suggests that the ALJ could rely on the VE's testimony as substantial evidence.  The number of addressing clerk jobs available nationally to which the VE testified was not so large as to be inherently unbelievable.

Considering only the order clerk and addressing clerk jobs, the ALJ identified more than 49,000 available jobs.  Based on the cases discussed above, this constitutes a significant number of jobs.

## V.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED:  June 08, 2023

KAREN E. SCOTT
United States Magistrate Judge